UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2005 FEB -2  P 4: 49

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| MARINUS WALRAVEN and<br>IRENE WALRAVEN,<br><br>    Plaintiffs,<br><br>v.<br><br>YARWAY CORPORATION,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO.
05-10197-WGY

## PLAINTIFFS' EMERGENCY MOTION TO REMAND

NOW COME the Plaintiffs, Marinus Walraven and Irene Walraven, by and through their attorneys, and hereby move this Honorable Court to remand this matter to Massachusetts State Court for continuation of trial against Defendants A.W. Chesterton Company ("Chesterton") and Yarway Corporation ("Yarway"). A jury trial was commenced on February 1, 2005 before the Honorable Jeffrey A. Locke at Suffolk Superior Court in Boston. Upon receipt of Yarway's Notice of Removal today, Judge Locke ordered a stay of the state court action and held over the jury members until Friday, February 4, 2005, pending the outcome of this Motion. In further support of their Motion, Plaintiffs state:

1.      Contrary to Yarway's cries of fraudulent joinder by Plaintiffs, this case has been improperly removed from state court by Yarway.

2.      The procedural history of this matter is only partially discussed in Yarway's Notice of Removal filed this day in the United States District Court for the District of Massachusetts. (See Notice at ¶ 1-2) Yarway failed to mention that, due to the exigent medical

condition of Plaintiff Marinus Walraven, who presently suffers from terminal mesothelioma, this case was advanced for trial on December 15, 2004, and subsequently continued until January 24, 2005. The Honorable Jeffrey A. Locke is currently presiding over the trial of this matter in Courtroom 5 at Suffolk Superior Court in Boston. After five (5) days of pretrial motions and jury selection which commenced on January 25, 2005, Plaintiffs are now in the midst of presenting their case in chief in a jury trial that is expected to last approximately two weeks.

      3.     In addition to Yarway, the only defendant remaining in the case at the commencement of opening arguments on February 1, 2005 was Chesterton. Plaintiffs allege exposure by Mr. Walraven to asbestos-containing gaskets manufactured and sold by Chesterton. Mr. Walraven, who is expected to take the witness stand later this week, previously testified in his discovery and evidentiary depositions that he was exposed to asbestos from, among other asbestos products, Chesterton gaskets throughout his career in the United States Navy (1944-1947), as a mechanic for Railway Express and Mack Truck (1949-1961) and as a welder/machinist for over thirty years at Procter & Gamble in Quincy (1961-1994). (See Exhibit A, Depositions of Marinus Walraven, April 28, 2004 and April 30, 2004, relevant excerpts.)

      4.     A.W. Chesterton Company is now, and was at the time the Massachusetts state court action was initiated in October 2004, a citizen of Massachusetts because it was and is incorporated in Massachusetts and its principal place of business was and is at 225 Fallon Road, Stoneham, Massachusetts 02180. (See Exhibit B, Secretary of State Records.)

      5.     Seeking desperately to derail the ongoing trial in Suffolk Superior Court, Yarway alleges, without any supporting facts, that Plaintiffs fraudulently joined Chesterton to the Massachusetts action to defeat complete diversity of citizenship. The crux of Yarway's argument for fraudulent joinder is as follows:

A.W. Chesterton had entered into a global settlement agreement negotiated with counsel for the Plaintiffs that released all of the claims asserted by the Plaintiffs in the State Court Action against Chesterton....As a result of the pre-existing settlement agreement that released and extinguished all of Plaintiffs' claims against A.W. Chesterton, Plaintiffs' inclusion of A.W. Chesterton in the State Court Action constitutes fraudulent joinder in an attempt to prevent complete diversity and thwart Yarway's statutory right to remove this action to the United States District Court.

Notice of Removal, at ¶¶ 3-4.

6.    Yarway's allegations are completely false. There is no evidence to support Yarway's allegation of fraudulent joinder in this case. In fact, the sole basis for Yarway's removal is a purported conversation which Yarway's counsel allegedly had in Illinois with William D. Shultz, Jr., Esq., local counsel for Chesterton. Mr. Shultz has indicated under oath that Yarway's representation's are false. (See Exhibit C, Affidavit of Attorney William D. Shultz, Jr., February 2, 2005.) Indeed, Mr. Shultz never indicated that plaintiffs' claims against Chesterton were settled, and in fact, he stated that he knew nothing about the status of the litigation in Massachusetts. (See id.)

7.    The purported "global settlement agreement" between Plaintiffs' counsel and Chesterton does not include the Walraven case. Counsel for the Plaintiffs, Edward Paul Coady, Esq., and counsel for Chesterton, John B. Manning, Esq., reached an agreement on October 14, 2003 to settle certain asbestos lawsuits then pending against Chesterton in Massachusetts State Court for agreed-upon values dependent on the asbestos disease. (See Exhibit D, Letter from Manning to Coady, October 16, 2003, redacted copy.) This agreement does not include the Walraven case. (See Exhibit E, Affidavit of Edward Paul Coady, Esq., February 2, 2005, and Exhibit F, Affidavit of John B. Manning, Esq., February 2, 2005.)

3

8.    More importantly, for purposes of Yarway's alleged basis for fraudulent joinder, the "global settlement agreement" specifically and unequivocally permits Plaintiffs' counsel to "opt out" two cases annually from the matrix agreement. Attorneys Coady and Manning, on behalf of their respective clients, previously agreed to opt out the Walraven case from any inclusion in the settlement agreement. (See Exhibit E, Coady Affidavit, at ¶ 5, and Exhibit F, Manning Affidavit, at ¶ 5.)

9.    Contrary to Yarway's assertions, the Plaintiffs' claims against Chesterton were never a part of any global settlement agreement. Yarway has failed to establish any basis for fraudulent joinder in the instant action, and consequently, this Court should remand the action to Suffolk Superior Court.

10.    The case law is very clear that any party basing removal on fraudulent joinder bears a heavy burden of proof, which Yarway obviously has not and cannot meet in this case. See In re Massachusetts Diet Drug Litigation, 338 F. Supp.2d 198 (D. Mass. 2004); see also Metropolitan Prop. and Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co., 780 F.Supp. 885, 889 (D.Conn. 1991). The United States District Court for the District of Massachusetts recently set forth the very stringent test for fraudulent joinder in the removal context as follows:

> A defendant who seeks to remove a case from the state court, asserting fraudulent joinder of a defendant, has the burden to prove by clear and convincing evidence either that there has been an outright fraud committed in the plaintiff's pleadings or that there is no reasonable basis in law and fact for the plaintiff's claim against the putative fraudulently joined defendant...So long as the plaintiffs have an objectively valid basis for joining [the defendant] in the complaint, their subjective motivations are largely irrelevant....To determine whether a party has been fraudulently joined to defeat diversity jurisdiction, a court starts with the parties' pleadings but may also consider summary judgment type evidence, such as affidavits, transcripts, and exhibits. All fact and legal ambiguities must be resolved in the plaintiff's favor. Further, the removal and diversity jurisdiction statutes should be strictly construed against federal jurisdiction to avoid infringing the rights of state courts to determine matters of state

law. Any doubts concerning the court's jurisdiction should be resolved against removal and in favor of remand to the state court.

In re Massachusetts Diet Drug Litigation, 338 F.Supp.2d at 202, *citing* Mills v. Allegiance Healthcare Corp., 178 F.Supp.2d 1, 4-6 (D.Mass. 2001).

11.    Other District Courts, including the District of Connecticut, apply the same stringent standard for fraudulent joinder removal:

> [a] joinder may be fraudulent and sham if the allegations in the plaintiff ['s] pleading with reference to the resident defendants are shown to be so clearly false and fictitious that no factual basis exists for an honest belief on the part of plaintiff that there is liability--in short that the joinder is without any reasonable basis in fact and is made without any purpose to prosecute the cause in good faith…

Metropolitan Prop. and Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co., 780 F.Supp. 885, 889 (D.Conn. 1991), *citing* Quinn v. Post, 262 F.Supp. 598, 603 (S.D.N.Y. 1967). If there is any reasonable basis for predicting that the controlling law might grant the plaintiffs the relief they seek against the resident defendant, the court will not disregard that defendant as nominal and the case must be remanded. See id. at 889-890.

12.    In the present case, Plaintiffs have not only properly pled their negligence, breach of warranty and loss of consortium claims against Chesterton, they have presented competent evidence that Plaintiff worked with Chesterton's asbestos-containing products, such that a jury could find this exposure to be a substantial contributing cause of Plaintiff's asbestos-related malignant mesothelioma. Therefore, joinder of Chesterton was and is proper and the case should be remanded forthwith to state court for continued trial proceedings against Yarway and Chesterton.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Honorable Court GRANT Plaintiffs' Emergency Motion to Remand and ORDER this case back to trial at Suffolk Superior Court.

Dated: February 2, 2005

Respectfully submitted,
The Plaintiffs,
By their attorneys,

Edward Paul Coady, Esq.
BBO No. 546079
Christopher P. Duffy, Esq.
BBO No. 648402
Coady Law Firm
205 Portland Street
Boston, MA  02114-1721
(617) 742-9510

George G. Tankard, Esq.
State Bar No. 24033541
Ron C. Eddins, Esq.
State Bar No. 24000926
Waters & Kraus, LLP
3219 McKinney Avenue, Suite 3000
Dallas, Texas 75204
(214) 357-6244

## CERTIFICATE OF SERVICE

I, Christopher P. Duffy, Esq., hereby certify that I served a true and correct copy of the attached document, Plaintiffs' Motion to Remand, upon all remaining counsel of record, via facsimile, on this 2nd day of February, 2005.

Christopher P. Duffy, Esq.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE
THIRD JUDICIAL CIRCUIT
MADISON COUNTY

MARINUS WALRAVEN and IRENE WALRAVEN, )
)
       Plaintiffs, )
)
       vs. ) No. 04-L-274
)
AMERICAN STANDARD, INC., et al., )
)
       Defendants. )


DISCOVERY DEPOSITION BY VIDEOCONFERENCE OF
MARINUS G. WALRAVEN

Taken on behalf of Defendants
April 28, 2004


William L. DeVries, CSR/CCR/RDR/CRR
ILLINOIS CSR NUMBER: 084-003893
MISSOURI CCR NUMBER: 566

Page 34

1    A. I used to cut gaskets for different
2  water pumps and things like that.
3    Q. I just want to limit --
     A. I was a helper.
5    Q. Okay. I just want to limit our
6  discussion to these two months in '44, okay?
7    A. Uh-huh.
8    Q. You said that you would cut gaskets
9  for water pumps?
10   A. Right.
11   Q. And you also mentioned to me before
12 that you did engine work?
13   A. Yeah.
14   Q. What did you mean by that?
15   A. Well, when they pulled the clutches
16 out I used to clean up the area or what not, and
17 the brake area too. Used to sweep the floors and
18 anything else that it required. You have to
19 remember, I was a seventeen year old kid.
20   Q. When you talked about cutting gaskets
21 for water pumps, do you associate any names with
22 those gaskets?
23   A. Garlock and Chesterton.
24   Q. Do you associate any other names with
25 those gaskets for the water pumps?

Page 35

1    A. Not that I can think of.
2    Q. Do you associate any names with the
3  water pumps themselves?
4    A. Usually the manufacturer of the
5  engine.
6    Q. What types of engines or manufactured
7  brands of engines did you work on during that
8  time?
9    A. General Motors, Ford, Studebaker. Of
10 course, the Studebaker engine wasn't made by
11 Studebaker then. They were made by
12 International. And Chrysler Corporation had a
13 few. That's where I learned how to cut the
14 gaskets and things like that.
15   Q. When you were a mechanic's helper?
16   A. Right.
17   Q. You had mentioned that you did engine
18 work as well?
19   A. Well, at that particular time I wasn't
20 doing much engine work. I more or less cleaned
21 up after somebody else did the -- stripped them
22 down and things.
23   Q. Okay. You said that you would help
24 take clutches out of vehicles?
25   A. Yeah.

Page 36

1    Q. Did you do that in '44, or did you do
2  that later on when you came back?
3    A. Both.
4      (Whereupon, a discussion was held off
5  the record.)
6    Q. (By Mr. Casmere) Do you associate any
7  names with the clutch materials?
8    A. No.
9    Q. Do you associate any names with the
10 engines that you would have done that work on?
11   A. Engines, yeah. General Motors and the
12 Ford. They had a lot of Fords there. They had
13 some Studebakers. It was kind of hard to say.
14 It's been a long time.
15   Q. And other than what you described as
16 working with clutches as engine work, is there
17 any other type of work that you'd characterize as
18 engine work that you did at that time?
19   A. Just cutting gaskets and putting them
20 in stock so that they could use them when they
21 take the fuel pumps off and manifolds and things
22 like that.
23   Q. So you made basically gaskets that
24 could be used later on by somebody else?
25   A. Right.

Page 37

1    Q. Did you at that point in time ever
2  remove any gaskets from the engines and then put
3  on new ones?
4    A. Yeah.
5    Q. Do you associate any names with those
6  engine gaskets that you either installed or
7  removed?
8    A. Garlock or Chesterton.
9    Q. Okay. Now I want to skip your time in
10 the U.S. Navy and go to the time when you came
11 back to Railway Express, okay?
12   A. Uh-huh.
13   Q. When did you come back to Railway
14 Express?
15   A. In June of '47.
16   Q. And then how long did you work there?
17   A. Probably a year, year and a half
18 maybe.
19   Q. And then where did you go from there?
20   A. Well, I was moonlighting a little bit
21 because I didn't get much work. I was unemployed
22 for a short time, and then I went to the Mack
23 Truck.
24   Q. When did you go to work for Mack
25 Truck?

Page 38

1    A. About '49, I think.
2    Q. Do you remember the month of '49 that
3 you went there?
4    A. No.
5    Q. And did you work there until 1960?
6    A. '61, yeah.
7    Q. And was that a continuous job from '49
8 to '61?
9    A. Yeah.
10    Q. Was it a full-time job?
11    A. Full-time job.
12    Q. Did you have any other employment
13 other than at Mack Truck from 1949 to 1961?
14    A. Only moonlighting. I used to pick up
15 a few dollars here and there. I -- also in that
16 time period I got a license, oil burner license.
17    Q. Okay. In your year to year and a half
18 that you worked back at Railway Express after you
19 got out of the service, from June of '47 until
20 sometime middle of 1948; is that right?
21    A. Yeah.
22    Q. Is there anything different about the
23 work that you did at Railway Express during that
24 time frame of June of '47 to mid-1948 that was
25 different from what you did the two months before

Page 39

1 you went into the service?
2    A. Only -- I was still a helper, but I
3 was trained for doing things, and I did a lot of
4 mechanical work then.
5    Q. Did you do the same --
6    A. Actual brake work.
7    Q. Did you do the same type of work in
8 June of '47 to mid '48 that you did in 1944 plus
9 more brake work; is that what you're saying?
10    A. Yes.
11    Q. Is there any names of materials that
12 you associate with your time from June of '47 to
13 mid '48 that's different from your time in
14 mid '44?
15    A. No. I still worked with the Garlock
16 and gasket materials, the Chesterton. And the
17 brakes, the different vehicles that I work on I
18 -- they ordered the brake parts from a local
19 place, and when -- the brake linings. When they
20 come in in a box, they were ordered for that
21 particular truck. So --
22    Q. Do you know the name of the place
23 where they ordered those materials?
24    A. Yeah, Boston Clutch.
25    Q. Can you give us any sort of an

Page 40

1 estimate as to how many brake repairs you were
2 involved in performing during your time from June
3 of '47 to mid '48?
4    A. Well, kind of hard, but I did quite a
5 few.
6    Q. Was there any particular frequency in
7 which you would have done that work?
8    A. Probably three or four a week or more.
9 Some weeks I did five or six and others,
10 depending on -- a big company. They had a lot of
11 trucks.
12    Q. Do you know how many trucks they had
13 during your time there from '47 to '48?
14    A. Well, they had four floors in the
15 garage and three of them were completely full of
16 trucks, and they packed them in there. Each
17 floor probably held sixty, seventy trucks, and
18 they're always on the go.
19    Q. Did you -- did it have the same setup
20 in terms of the number of trucks and the same
21 kind of garage when you were there in '44?
22    A. Yeah.
23    Q. Then I think you said that -- well, is
24 there anything else about your work at that
25 Railway Express during that time frame that's

Page 41

1 different from what you did before that you
2 haven't told me about?
3    A. A long time ago. No, I don't think
4 so.
5    Q. Was your title there still a
6 mechanic's helper?
7    A. I was a mechanic's helper all the time
8 I worked for them.
9    Q. And then you said you moonlighted a
10 little bit and were unemployed?
11    A. When I was unemployed, yes.
12    Q. About how long of a period of time is
13 that, right after this Railway Express job?
14    A. Six months or a year.
15    Q. For any of that period of time, that
16 six months to a year, do you believe that you
17 worked with or around any asbestos containing
18 materials?
19    A. No, I was selling cars just to keep --
20 so I don't think I was exposed to anything then.
21    Q. When you were selling cars were you
22 involved in the maintenance of any of those
23 vehicles?
24    A. No.
25    Q. What kind of cars did you sell?

Page 46

1  be made for them and things like that. We would
2  buy the gaskets, one or the other.
3      Q. So you would either buy the gaskets or
   make them; is that what you're saying?
5      A. Yeah. Exhaust manifold gaskets and
6  intake manifold gaskets, water pump gaskets.
7  When you'd have a block knocked apart there was
8  new valves and things. You'd have to do all
9  these things.
10     Q. Do you associate any names with the
11 gaskets that were used at the Mack Truck facility
12 during that time?
13     A. Well, we had Garlock and Chesterton.
14 Probably some others, but I can't recall them
15 all.
16     Q. Do you associate any names with the
17 water pumps that were worked on there?
18     A. No. They were Mack water pumps, and
19 if anything other than the Mack for repairs, I
20 don't remember.
21     Q. How about the engines, what make or
22 model of the engine did you work on? Were they
23 all Mack engines?
24     A. All Macks, yeah.
25     Q. You said they did work on generators.

Page 47

1  Do you associate anything with the generators?
2      A. Delco Remy.
3      Q. Delco Remy?
4      A. Yeah.
5      Q. And starters, you said starters. Do
6  you associate any names with the starters?
7      A. Delco Remy. I went to a Delco Remy
8  school. That's one of the reasons why Proctor &
9  Gamble -- I mean why the Mack Truck hired me,
10 because they were behind in their repairs and
11 electrical end of it and generators and starters
12 they had to rebuild.
13     Q. Did you go to the Delco school before
14 you went to work for Mack Truck?
15     A. While I was working for Railway
16 Express they sent me to Delco Remy school.
17     Q. Okay. You said that they would take
18 in trade-ins as well?
19     A. Yeah.
20     Q. Did you work on any other type of
21 vehicles, either brake work or clutch work or
22 engine work on any other vehicles other than Mack
23 Trucks at that time?
24     A. Occasionally.
   Q. Can you tell me if you recall any of

Page 48

1  the brand names of those vehicles?
2      A. Well, I know I worked on a General
3  Motors -- General Motors tractors. I know I did
4  brake work on them. Few Fords.
5      Q. Are these like trucks or --
6      A. Trucks, yeah. Most of them were
7  trucks.
8      Q. And the Mack Truck sales and service
9  center where you worked, did they sell -- what
10 kind of trucks did they sell, do you know?
11     A. Yeah. It was tractors, dump trucks,
12 vans. Most of them were tractors hauling
13 trailers, but they sold big dump trucks and
14 heavy-duty, off-road equipment also.
15     Q. Your work there from '49 to '61, was
16 there any particular frequency in which you did
17 brake work there?
18     A. Maybe once or twice a week I was doing
19 a brake work. Maybe more.
20     Q. How about the clutch work, was there
21 any sort of frequency in which you would have
22 done that work?
23     A. They were doing -- continuously clutch
24 work was being done regularly because they didn't
25 have automatic transmissions in them in them

Page 49

1  days, especially in the dump trucks and things
2  like that. They were always putting clutches in
3  them. So it was a continuous job. May work an
4  hour or two a day on that.
5      Q. Was your work as a mechanic at Mack
6  Truck from '49 to '61 limited to doing mechanic
7  duties on the vehicles?
8      A. Most of the time.
9      Q. Did you have any responsibility for
10 maintaining the facility itself?
11     A. No.
12     Q. Did they do any sort of remodeling or
13 construction on that Mack Truck facility from '49
14 to '61?
15     A. Yeah, probably did.
16     Q. Do you recall any of that being done?
17     A. Well, they had a show. I don't know
18 what year it was that they used the second floor
19 of the building. It happened to be empty at the
20 time for a demonstration on when the new diesels
21 came out, and what they did is there closed all
22 the windows and the doors in there, and they put
23 the trucks inside there and they started them up
24 and they ran them that way, and they let the
25 people walk around in there, but I don't remember

Page 94

1    A. That's a hard question to answer
2  because I can't -- it was sixty years ago.
3    Q. I understand. So the answer is you're
   not sure?
5    A. Yes.
6    Q. Okay.
7    A. But I have to assume that it's the
8  same as the stuff I used later on.
9    Q. And you assume that because it looked
10  identical?
11    A. Yeah.
12    Q. The material itself looked identical?
13    A. Yeah.
14    Q. Okay.
15    A. It did.
16    Q. Do you happen to know when the product
17  Kaylo was approved by the Navy for use?
18    A. No.
19    Q. Okay. Other than what we talked about
20  doing the work in the boiler room?
21    A. Uh-huh.
22    Q. As a fireman and then this work down
23  in the engine room as a fireman, is there any
24  other type of activity that you did?
25    A. Yeah. I worked on the small boats

Page 95

1  that -- on the Davids, you know, that we used in
2  the invasions.
3    Q. And then you eventually became a motor
4  machinist mate?
5    A. Right.
6    Q. And what type of work did you do as a
7  motor machinist mate on the J. Franklin Bell?
8    A. I was in the A division, which took
9  care of a lot of auxiliary equipment on the ship.
10  Took care of the fire pumps, the smoke
11  generators, all the boats that were in the
12  Davids, the evaporators for making fresh water.
13  A division took care of a lot of auxiliary
14  equipment. A meant auxiliary.
15    Q. Did any of your work on that auxiliary
16  equipment involve you working with the gaskets?
17    A. Yeah.
18    Q. Do you associate any names with the
19  gaskets on those auxiliary pieces of equipment?
20    A. Well, generally they were Garlock and
21  Chesterton.
22    Q. And do you recall the names of any of
23  these different types of auxiliary pieces of
24  equipment?
25    A. Yeah, we had fire pumps. We had a

Page 96

1  booster diesel running it. Smoke generators, I
2  really don't know what -- how they worked or
3  anything, but we used to have to take the covers
4  off and replace the gaskets after they were used
5  and put them back on again.
6    Q. Your work as a motor machinist mate,
7  did that involve you at all working with the
8  insulation on the valves, or was that only when
9  you were a fireman?
10    A. Only when I was a fireman.
11    Q. So your work on the J. Franklin Bell
12  with the valve insulation and the pipe insulation
13  was only when you were as a fireman that you
14  described; is that right?
15    A. No, because I was called into the
16  other departments too in the boiler room for
17  occasion -- not the boiler room. In the engine
18  room to do -- fill in a shift, you know. And
19  whatever happened on that shift we had to do.
20    Q. And did you get called into the engine
21  room when you were also a motor machinist mate?
22    A. Yes. Yes.
23    Q. Is your work with the valve insulation
24  and the pipe insulation limit -- on the J.
25  Franklin Bell limited to when you were down in

Page 97

1  the engine room?
2    A. Yeah.
3    Q. Okay. And eventually you came back to
4  San Francisco -- or was it San Francisco that it
5  was decommissioned?
6    A. Yeah.
7    Q. And you said that you helped tear down
8  pumps and then repack them?
9    A. There was a crew of people,
10  contractors, and we were in the area, and it was
11  our job to make sure that the -- well, some of it
12  was troubleshooting. Depended on which pieces of
13  equipment should be replaced, and the rest of it
14  was cleaning up, making sure that the place was
15  cleaned when they finished.
16    Q. What were you cleaning up, all the --
17    A. Dust and everything else.
18    Q. What did they do during the
19  decommissioning, did they take out the boilers
20  and the turbines?
21    A. No. No. We left them in there
22  because they were fairly new anyhow, but the
23  valves, some of the big valves were taken out and
24  replaced. Throttle valves especially was -- we
25  had two engines both forward and reverse. Those

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE
THIRD JUDICIAL CIRCUIT
MADISON COUNTY


MARINUS WALRAVEN and IRENE WALRAVEN, )
                                      )
          Plaintiffs,                 )
                                      )
     vs.                              ) No. 04-L-274
                                      )
AMERICAN STANDARD, INC., et al.,      )
                                      )
          Defendants.                 )



VIDEOTAPED EVIDENTIARY DEPOSITION BY
VIDEOCONFERENCE OF MARINUS G. WALRAVEN

Taken on behalf of Plaintiffs
April 30, 2004



William L. DeVries, CSR/CCR/RDR/CRR
ILLINOIS CSR NUMBER: 084-003893
MISSOURI CCR NUMBER: 566

Page 30

1   A. Uh-huh.
2   Q. Were you exposed, do you believe, to
3 asbestos fibers from those products?
4   A. Well, had to make the gaskets if they
5 weren't available.
6   Q. Okay.
7   A. And I had to remove them.
8   Q. Okay.
9   A. And I had to use a scraper or wire
10 brush.
11   Q. Let's talk how do you make gaskets.
12 What would you do to make a gasket, say for an
13 engine, an automotive engine or a pump or a
14 clutch?
15   A. Take a sheet of asbestos material,
16 either Garlock or some other kind.
17   Q. Okay.
18   A. Take a sheet of material and I'd cut
19 it. If I had the flange to make up one or the
20 piece that I was making up on, I'd use a soft
21 hammer and then I'd go around the edge of it and
22 it would leave an impression on the gasket
23 material, and then I'd cut it out. Sometimes you
24 could knock it out all the way with a hammer.
25   Q. Okay. And now, I guess to put this

Page 31

1 gasket -- this new gasket on you would've taken
2 an old gasket off?
3   A. Right.
4   Q. And describe how you would take a
5 gasket off in the automotive setting for me, the
6 engine or --
7   A. Well, if you were lucky, they fell
8 off.
9   Q. Okay.
10   A. If you weren't, you had to scrape them
11 off.
12   Q. All right. And what did you use to
13 scrape gaskets off these --
14   A. Putty knives, and I made special tools
15 that were shaped like a screwdriver with a wide
16 face on it and were sharpened like a chisel, and
17 you'd scrape it with that.
18   Q. Okay. And why would gaskets tend to
19 be stuck on a surface like that, an engine or a
20 pump or a clutch?
21   A. Oh, if it was on any length of time or
22 even if it wasn't, you'd compress them and you'd
23 tighten them up and they get stuck on there.
24   Q. What were the names of the gaskets
25 that you used in taking them on and off these

Page 32

1 vehicles?
2   A. Garlock and -- there's another one
3 that was very common.
4   Q. Chesterton?
5   A. Chesterton, I believe.
6   Q. Okay. Did you use Garlock and
7 Chesterton gaskets routinely in this application?
8   A. Yeah.
9   Q. All right. How did you know
10 Garlock -- how did you know a gasket was named
11 Garlock?
12   A. Well, it was written right on the
13 material.
14   Q. So you could tell, no matter if you
15 were putting one on or taking it off, that it was
16 Garlock?
17   A. Yes. Yeah.
18   Q. All right. And what were these
19 gaskets made of, sir?
20   A. Asbestos.
21   Q. Okay. Is it your testimony they were
22 used in engines, pumps, and clutches on cars?
23   A. Uh-huh. Yeah.
24   Q. All right. When did you first
25 personally start applying and removing gaskets in

Page 33

1 the automotive setting?
2   A. When I had first learned the trade,
3 way back in Railway Express, and even in high
4 school we would work around shops and stuff.
5   Q. You knew --
6   A. We made gaskets. Sure. I knew then
7 it was made of asbestos.
8   Q. Okay. So you started at least in 1944
9 you're saying?
10   A. Yeah. Yeah.
11   Q. Did you use them all the way through
12 your career, these gaskets?
13   A. Right.
14   Q. Did the names of the types of gaskets
15 you used ever change, Garlock and A.W.
16 Chesterton?
17   A. Not that I know of. Probably it
18 was --
19   Q. When you removed a gasket in this type
20 of setting, can you describe what the conditions
21 would be like if you had to -- if they didn't
22 just pop off and you had to --
23   A. Oh, if they didn't come off we'd buy a
24 scraper and used a wire brush and a drill and a
25 power tool, and you'd keep on wearing it out.

Page 38

1    Q.  How did you know that?
2    A.  Everything we -- that was common
3  knowledge.  That was --
4    Q.  Okay.  All right.  And did you put
5  gaskets on and remove gaskets from those engines?
6    A.  Yeah.
7    Q.  Same way you described earlier?
8    A.  Yeah.
9    Q.  And I think the Caterpillar tractor
10  you mentioned as well?
11    A.  Uh-huh.
12    Q.  And was that up in Alaska?
13    A.  That was up in the Aleutians, yeah.
14    Q.  And what kind of an engine did that
15  tractor have on it?
16    A.  Had a huge six cylinder engine,
17  straight six.
18    Q.  All right.  And were you exposed to
19  asbestos from dealing with that engine,
20  Caterpillar --
21    A.  Yeah, well, I had to change the
22  gaskets in it.  That's the only exposure I had on
23  that.
24    Q.  And again, your engine exposure is
25  through the gasket exposure?

Page 39

1    A.  Through the gasket material.
2    Q.  Is it changed any from the way you
3  described it earlier?
4    A.  Well, I had to.  I had to pull pumps
5  off and a few other things.  And gaskets around
6  the fuel filters and things, to that effect.
7    Q.  Okay.
8    A.  And we had to make them up because we
9  didn't have them available.
10    Q.  Okay.  And can you give us the type of
11  gasket that was used in all of these engines over
12  the years?  Did the names change at all or were
13  they the same names?
14    A.  It was Garlock or Chesterton.
15    Q.  Okay.  Is it your testimony that these
16  gaskets contain asbestos at all times?
17    A.  Yes.
18    Q.  And is it your testimony that you were
19  exposed to these gaskets for what sounds like
20  fifty years or so?
21    A.  At least.
22    Q.  Okay.  I'm going to jump ahead just to
23  gaskets quickly since we're talking about them,
24  and I understand that gaskets from your testimony
25  earlier spans really your entire work history,

Page 40

1  doesn't it?
2    A.  Yes, it does.
3    Q.  And we just talked about them in the
4  automotive sense, didn't we?
5    A.  Yeah.
6    Q.  Okay.  Now, let's talk about them in
7  the other phases of your life.  In the Navy did
8  you work with gaskets?
9    A.  Yes, I did.
10    Q.  All right.  Now, you just described
11  working with gaskets on Gray Marine diesel
12  engines, right?
13    A.  Uh-huh.
14    Q.  Did you work with gaskets on other
15  pieces of machinery in the Navy?
16    A.  Yes.
17    Q.  What types of machinery did you work
18  on?
19    A.  Pumps, valves.
20    Q.  Okay.  And how were --
21    A.  Steam lines.
22    Q.  All right.  How were gaskets used in
23  connection with pumps and valves and steam lines
24  in the Navy?
25    A.  Well, the pumps would leak or you'd

Page 41

1  have to pull it apart in order to repair it.
2    Q.  All right.  Same thing with steam
3  lines?
4    A.  Yeah.  Steam lines, if you had to pull
5  a unit out, you had to break the steam lining at
6  the flange.  It was flange gaskets in it.
7    Q.  The gasket would be on the flanges of
8  the pumps?
9    A.  Flanges of the pump, yeah.
10    Q.  Anyplace else in the pump?
11    A.  Yeah, where they were put together.
12    Q.  Okay.  And --
13    A.  Different sections put together.
14    Q.  All right.  So how many gaskets would
15  there be in a particular pump?
16    A.  Pump, oh, you may run into eight or
17  ten of them, depending on the size of the pump
18  and the -- most cases it was maybe four
19  generally.
20    Q.  Okay.  All right.
21    A.  But there were a lot of smaller
22  applications.
23    Q.  Now, just to jump ahead, did you work
24  with pumps at Proctor & Gamble as well?
25    A.  Yes, I did.

Page 42

1    Q.  So you -- is it fair to say you worked
2  with pumps between really 1947 and through 1987?
3    A.  Yeah.
     Q.  About forty years?
5    A.  And then some, yeah.
6    Q.  And then some.  And did you use
7  gaskets in connection with these pumps during
8  this whole period of time?
9    A.  Absolutely, yeah.
10   Q.  And what about -- you mentioned
11 valves.  Did you work with valves in the Navy?
12   A.  Yes.
13   Q.  And did you work with valves at
14 Proctor & Gamble?
15   A.  Yes.
16   Q.  All right.  Can you describe for me
17 how you would use a -- or have used a gasket in
18 connection with valves both in the Navy and
19 Proctor & Gamble, just in a general sense?
20   A.  Well, they had flanges on them.  You'd
21 have to break the flanges, clean them up and put
22 new gaskets in them, and most cases you'd take it
23 apart because there was something wrong with it,
24 so -- the packing and what not, and it's got a
25 gland on the top of the valve.  That had a gasket

Page 43

1  in it that had to be taken apart and replaced.
2    Q.  You mentioned packing.  What is
3  packing?
4    A.  Packing is -- it's a material that
5  they put around the shaft to prevent it from
6  leaking where things have to move, either a dry
7  shaft or a handle to open and close a valve.
8    Q.  Okay.  So is it your testimony you
9  used both gaskets and packing in connection with
10 valves and pumps throughout your career in the
11 Navy and Proctor & Gamble?
12   A.  Excuse me?
13   Q.  Did you use gaskets and packing --
14   A.  Yes, I did.  Yeah.
15   Q.  -- in connection with valves and
16 pumps?
17   A.  Yes, I did.  Yeah.
18   Q.  Does this span your entire career?
19   A.  Yeah.
20   Q.  Did you ever have to change valves
21 on -- I mean change gaskets on pumps and valves
22 during this time frame?
23   A.  Yes, regularly.
24   Q.  And can you describe for the jury how
   you would do that?

Page 44

1    A.  Changed the -- changed the gaskets.
2    Q.  Changed the gasket on a pump?
3    A.  Every time I took a pump apart there's
4  gaskets in there that had to be replaced.
5    Q.  Okay.
6    A.  Whether it be the bonnet valve or the
7  flange valves, the flange -- flanges on the pump
8  where the pipes meet.
9    Q.  Okay.  And did you have to remove
10 those gaskets to replace them?
11   A.  Yes.
12   Q.  And how did you remove the gaskets
13 from these pumps and valves?
14   A.  If they didn't come out easy, you had
15 to do the scraping.  Sometimes you had to pull
16 the studs out because they were in the way.  Then
17 you could scrape them and clean them.
18   Q.  What tools did you use to remove
19 gaskets?
20   A.  Mostly mechanical tools, and we have
21 special packing removing tools.
22   Q.  Okay.
23   A.  Special pipe fitting tools like
24 corkscrews that they take the packing out.
25   Q.  Okay.  Focusing on the gasket for a

Page 45

1  minute, do you know who made the gaskets that you
2  used in the Navy and at Proctor & Gamble?
3    A.  Garlock and Chesterton.
4    Q.  All right.  Do you know who made the
5  packing that you used in the Navy and Proctor &
6  Gamble?
7       MS. BEHNEN:  Objection, compound.
8    A.  Crane or Garlock.
9    Q.  (By Mr. Coady)  Okay.  You
10 mentioned -- what were the conditions, what were
11 the -- did you actually remove these gaskets
12 yourself from pumps and valves?
13   A.  Yeah.
14   Q.  And would've been around others who
15 would've been doing it?
16   A.  Yeah.
17   Q.  And can you describe for me what
18 conditions were occasioned by this type of work?
19   A.  Most of these pumps and valves were
20 all covered with insulation to begin with.  So
21 you had to remove the insulation first, and then
22 to get at the valves to do the -- to do the work
23 on them.
24   Q.  What type of insulation was around
25 them, if you know?



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

## A. W. CHESTERTON COMPANY Summary Screen

?
Help with this form

Request a Certificate

**The exact name of the Domestic Profit Corporation:** A. W. CHESTERTON COMPANY

**Mergered with :** COMMERICAL CHEMICAL COMPANY, ! on 12/31/74
**Mergered with :** A. W. CHESTERTON, INC. (DE) on 1/31/85
**Mergered with :** SEALING RESOURCES, INC. (WV) on 1/31/85

**Entity Type:** Domestic Profit Corporation

**Status:** Active

**Identification Number:** 041173400

**Date of Organization in Massachusetts:** 12/24/1907

**Current Fiscal Month / Day:** 12 / 31

**Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street: 225 FALLON RD.
City or Town: STONEHAM      State: MA      Zip: 02180      Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:      State:      Zip:      Country:

**The name and address of the Registered Agent:**
Name: JOSEPH E. RILEY
No. and Street: C/O A. W. CHESTERTON COMPANY
225 FALLON RD.
City or Town: STONEHAM      State: MA      Zip: 02180   Country: USA

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | RICHARD F HOYLE | 3 ESTES ST<br>AMESBURY, MA 01913 USA | - |
| TREASURER | RONALD J. MAXWELL | 83 STULTS RD.,<br>BELMONT, MA 02178 USA | |

| | | | |
|---|---|---|---|
| SECRETARY | JOSEPH E RILEY | 94 WAYSIDE INN ROAD<br>FRAMINGHAM, MA 01701 USA | - |
| VICE PRESIDENT | ARTHUR S RYAN | 125 BURLINGTON ST<br>LEXINGTON, MA 02420 USA | - |
| DIRECTOR | DAVID W HAYES | 42 IMRIE STREET<br>RANDOLPH, MA 02364 USA | 2004 |
| DIRECTOR | RICHARD F HOYLE | 3 ESTES ST<br>AMESBURY, MA 01913 USA | - |
| DIRECTOR | JOHN CARROLL | 888 TITTINGHAST ROAD<br>E. GREENWICH, RI 02818 USA | 2004 |
| DIRECTOR | ARTHUR BLASBERG, JR | 54 BEACON ST<br>BOSTON, MA 02108 USA | 2004 |
| DIRECTOR | JAMES D CHESTERTON | 117 BOW ST - B2<br>PORTSMOUTH, NH 03801 USA | 2004 |

**business entity stock is publicly traded:** ___

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share<br>Enter **0** if no Par | Total Authorized by Articles<br>of Organization or Amendments | | Total Issued<br>and Outstanding |
|---|---|---|---|---|
| | | *Num of Shares* | *Total Par Value* | *Num of Shares* |
| CNP | $0.00000 | 100,000 | $0.00 | 82,400 |
| CWP | $1.00000 | 100,000 | $100,000.00 | 82,400 |

___ Consent    ___ Manufacturer    ___ Confidential Data    ___ Does Not Require Annual Report

___ Partnership    **X** Resident Agent    **X** For Profit    ___ Merger Allowed

**Select a type of filing from below to view this business entity filings:**
ALL FILINGS
Administrative Dissolution
Annual Report
Application for Reinstatement
Application For Revival

Case 1:05-cv-10197-WGY    Document 2-3    Filed 02/02/2005    Page 3 of 3



© 2001 - 2005 Commonwealth of Massachusetts
All Rights Reserved

Help

STATE OF ILLINOIS    )
                      )
COUNTY OF ST. CLAIR   )

## AFFIDAVIT OF WILLIAM D. SHULTZ, JR.

William D. Shultz, Jr., being duly sworn and under oath, deposes and states as follows:

1.    I am of legal age and under no disability;

2.    I have been a licensed Illinois attorney since 1991. Since 1999, I have been an attorney with the firm of Cates, Kurowski, Bailey & Shultz, LLC in Swansea, Illinois.

3.    My firm has represented A.W. Chesterton Company for many years in local asbestos litigation filed in Madison and St. Clair County, Illinois.

4.    I recently was contacted by Milton Spaulding, an attorney with Spencer, Fane, Britt and Browne in St. Louis Missouri. Mr. Spaulding inquired if A.W. Chesterton was named in or settled the Walraven matter that was filed in Madison County, Illinois last year. I informed Mr. Spaulding that I knew the case was transferred on forum out of Madison County and that A.W. Chesterton was not named in that case nor had settled the case to my knowledge.

5.    Mr. Spaulding then informed me that his firm represents a defendant named in the case and the case was transferred to Massachusetts. I told Mr. Spaulding that I knew nothing about the Massachusetts litigation.

Further, affiant sayeth naught.

_____
WILLIAM D. SHULTZ, JR.

STATE OF ILLINOIS          )
                           ) SS.
COUNTY OF ST. CLAIR        )

    William D. Shultz, Jr., being duly sworn on oath, deposes and says that the contents contained in the foregoing document are true and correct to the best of his knowledge, information and belief.

WILLIAM D. SHULTZ, JR.

SUBSCRIBED AND SWORN to before me this 2nd day of February 2005.

Notary Public

OFFICIAL SEAL
RENEE J P EDWARDS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 10/01/07

COOLEY MANION JONES LLP

COUNSELLORS AT LAW

21 CUSTOM HOUSE STREET

BOSTON, MASSACHUSETTS 02110-3536

(617) 737-3100

FACSIMILE (617) 737-3113

www.cooleymanionjones.com

JON S. BAROOSHIAN
RICHARD M. BURKE
KATHRYN R. COLBURN
EARLE C. COOLEY
DONNA R. CORCORAN
CHRISTOPHER J. CUNIO
ROBERT A. DELELLO
MARC E. FITZGERALD
JENNIFER D. FUREY
MARTIN F. GAYNOR III
BRIAN D. GROSS
JOHN T. HUGO
TRACY A. R. JOLLY
PATRICK T. JONES*
TIMOTHY C. KELLEHER III
HARRY L. MANION III
JOHN E. MANNING
KENNETH J. MARTIN
LISA M. SNYDER
NICHOLAS D. STELLAKIS
JONATHAN P. TABASKY*†

PAUL F. BECKWITH
LEONARD T. EVERS
KEVIN M. GLYNN
FRANK A. MARINELLI*
CHRISTINE M. NORTH*
PETER J. SCHNEIDER
OF COUNSEL

————————

RHODE ISLAND OFFICE

ONE CENTER PLACE

PROVIDENCE, RHODE ISLAND 02903

(401) 273-0600

*ALSO ADMITTED IN RHODE ISLAND
†ALSO ADMITTED IN CONNECTICUT
^ALSO ADMITTED IN CALIFORNIA

October 16, 2003

<u>BY FACSIMILE AND FIRST CLASS MAIL</u>

Edward Paul Coady, Esq.
Coady Law Firm
205 Portland Street
Boston, MA 02114

    Re:  <u>A.W. Chesterton Company's Massachusetts Asbestos Litigation</u>

Dear Bud:

    This letter is to confirm our discussion on Tuesday, October 14, 2003, during which we agreed to establish matrix values for clients of your firm who have sued the A.W. Chesterton Company alleging asbestos-related damages.  The agreed upon matrix values are as follows:

    1.    Mesothelioma:  ███████████
    2.    Other Cancer:  ████████ and
    3.    Asbestos-related lung disorder:  ██████.

    As we discussed, upon receipt of appropriate medical documentation and an executed release (which includes an exposure affidavit) for each of the above-referenced plaintiffs, A.W. Chesterton Company will issue payment pursuant to a mutually agreeable schedule.  The first installment of this agreement will be paid on those trial listed cases that your firm has agreed to report as "settled" in anticipation of this agreement.  These proceeds are due no later than January 15, 2004, provided we have received the appropriate documentation.

    At our October 14, 2003, meeting I provided you with a list of pending cases in which the A.W. Chesterton Company has a record of receiving service.  It is my understanding that you are going to reconcile this list with your own records and follow-up with me to finalize the list of pending cases and their disease mix.

COOLEY MANION JONES LLP

Edward Paul Coady, Esq.
October 16, 2003
Page 2

    Going forward, we have agreed to apply these matrix values to
future qualifying cases filed by clients of your firm against the A.W.
Chesterton Company. Naturally, it will be necessary for us to meet
annually or semi-annually to reconcile our case lists and to schedule
payments. Finally, you have agreed to limit "opt outs" to this matrix
arrangement to two cases annually.

    It was a pleasure working with you.

                        very truly yours,

                        John B. Manning

JBM:r
115343

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARINUS WALRAVEN and IRENE WALRAVEN, | ) ) ) ) | CIVIL ACTION NO. 05-10197-WGY |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| A.W. CHESTERTON CO., YARWAY CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF EDWARD PAUL COADY, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND

I, Edward Paul Coady, Esq., depose and state as follows:

1.　　I am the owner of Coady Law Firm, 205 Portland Street, Fifth Floor, Boston, Massachusetts 02114-1721. I am duly licensed to practice law in the Commonwealth of Massachusetts.

2.　　I represent the plaintiffs in the above-captioned action. I have personal knowledge of the following facts, and if called, I could and would competently testify thereto.

3　　On or about October 13, 2003, I met with Attorney John B. Manning of Cooley Manion Jones LLP, 12 Custom House Street, Boston, Massachusetts 02110-3536, to discuss settlement of certain asbestos cases then pending in Massachusetts state court against A.W. Chesterton Company ("Chesterton").

4.    Our resulting agreement is memorialized in Attorney Manning's letter dated October 16, 2003, a true and correct copy of which is attached as Exhibit ___ to Plaintiffs' Motion to Remand. At that time, the Plaintiffs had not even contacted my office yet, and I did not represent them until February 2004. The Walraven case was never referenced or discussed during our meeting, and has not been settled under this or any other global settlement agreement.

5.    Our agreement specifically allows me to opt out two (2) cases annually from the agreed-upon settlement values. I exercised my right to exclude the Walraven case from this settlement agreement. Consequently, the settlement agreement does not apply to this case.

6.    Defendant Yarway Corporation ("Yarway") has cited this agreement to allege that Plaintiffs fraudulently joined Chesterton and thereby remove this action to the United States District Court for the District of Massachusetts. Contrary to Yarway's contentions, the agreement between myself and Attorney Manning does not release and extinguish Plaintiffs' claims against Chesterton.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY
ON THIS 2ND DAY OF FEBRUARY, 2005.

_____
Edward Paul Coady, Esq.

Subscribed and sworn to before me on this ___2ND___ day of ___FEBRUARY___, 2005.

ALISON STACKPOLE
Notary Public
Commonwealth of Massachusetts
My Commission Expires Jun 12, 2009

_____
Notary Public
My commission expires: 6·12·09

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARINUS WALRAVEN and IRENE WALRAVEN, | ) ) ) | CIVIL ACTION NO. 05-10197-WGY |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| A.W. CHESTERTON CO., YARWAY CORPORATION, | ) ) ) |  |
| Defendants. | ) ) ) |  |

## AFFIDAVIT OF JOHN B. MANNING, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND

I, John B. Manning, Esq., depose and state as follows:

1.     I am a partner at Cooley Manion Jones LLP, 21 Custom House Street, Boston, Massachusetts 02110-3536. I am duly licensed to practice law in the Commonwealth of Massachusetts.

2.     I represent Defendant A.W. Chesterton Company ("Chesterton") in the above-captioned action. I have personal knowledge of the following facts, and if called, I could and would competently testify thereto.

3     On or about October 13, 2003, I met with Attorney Edward Paul Coady of Coady Law Firm, 205 Portland Street, Fifth Floor, Boston, Massachusetts 02114-1721, to discuss settlement of certain asbestos cases then pending in Massachusetts state court against my client.

4.      Our resulting agreement is memorialized in my letter dated October 16, 2003, a true and correct copy of which is attached as Exhibit ___ to Plaintiffs' Motion to Remand. The <u>Walraven</u> case was never referenced or discussed during our meeting, and has not been settled under this or any other global settlement agreement.

5.      Our agreement specifically allows Attorney Coady to opt out two (2) cases annually from the agreed-upon matrix settlement values. He exercised his right to exclude the <u>Walraven</u> case from our settlement agreement. Consequently, the settlement agreement does not apply to this case.

6.      Defendant Yarway Corporation ("Yarway") has cited this agreement to allege that Plaintiffs fraudulently joined Chesterton and thereby remove this action to the United States District Court for the District of Massachusetts. Contrary to Yarway's contentions, the agreement between myself and Attorney Coady does not release and extinguish Plaintiffs' claims against Chesterton.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY
ON THIS 2ND DAY OF FEBRUARY, 2005.

John B. Manning, Esq.

Subscribed and sworn to before me on this ___2^rd___ day of ___February___, 2005.

Barbara Ann Capone
Notary Public
My commission expires: 3/26/10